THE LEWIS LAW FIRM
Anthony B. Lewis, CA Bar #237354
alewis@lewisla.com
Mario L. Grimm, CA Bar #279164
mgrimm@lewisla.com
16000 Ventura Blvd., Suite 1205
Encino, CA  91436
Tel:  (818) 338-6930
Fax:  (818) 338-6935

HIRST LAW GROUP, P.C.
Michael A Hirst, Esq. CA Bar #131034
michael.hirst@hirstlawgroup.com
200 B Street, Suite A
Davis, CA 95616
Tel:  (530) 756-7700
Fax: (530) 756-7707

Attorneys for Plaintiff,
JEAN DIESTO

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEAN DIESTO, an individual<br><br>                            PLAINTIFF,<br><br>     v.<br><br>FRESENIUS MANAGEMENT SERVICES, INC., a Delaware corporation, FRESENIUS MEDICAL CARE HOLDINGS, INC., a New York corporation, and DOES 1 through 10, inclusive,<br><br>                            DEFENDANTS. | CASE NO:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES FOR:**<br><br>1. Retaliation in violation of 31 U.S.C. § 3730(h)<br><br>2. Retaliation in violation of Cal. Gov't Code § 12653<br><br>3. Retaliation in violation of Cal. Labor Code § 1102.5(c)<br><br>4. Wrongful Termination in violation |

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

of Public Policy

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Jean Diesto ("Plaintiff" or "Diesto"), through her attorneys The Lewis Law Firm and Hirst Law Group, P.C., alleges as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

2.      Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents can be found, reside, transact business, or otherwise engaged in fraudulent conduct within the district.

## II.   NATURE OF THIS ACTION

3.      This action alleges that Plaintiff was retaliated against and wrongfully terminated in violation of federal and state law for attempting to prevent Defendants Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America, and Fresenius Management Services, Inc., (collectively "Defendants" or "Fresenius") from fraudulently billing government health care programs and using the Chronic Kidney Disease ("CKD") programs to funnel

1  patients to the Fresenius dialysis units.

2      4.    Plaintiff learned that Defendants were paying illegal kickbacks to

3  nephrologists as part of a joint venture program through which doctors in a

4  position to refer patients to Defendants' dialysis clinics were provided excessive

5  compensation to induce such referrals.  In addition, Diesto learned that Defendants

6  were illegally billing for kidney disease education services provided within

7  Defendants' dialysis facilities, and knowingly failing to disclose to the government

8  the location where the services were provided.  Plaintiff reasonably and correctly

9  believed that Defendants' illegal conduct was defrauding federal and state health

10  care programs.  Diesto objected to, and attempted to stop, Defendants' fraud

11  against the government.  As a result, Defendants retaliated against Plaintiff and

12  fired her.

13      5.    Defendants' conduct constitutes a violation of the federal False

14  Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA" or "Act"), the California False

15  Claims Act ("California FCA"), Government Code §§ 12650 *et seq.*, California

16  Labor Code § 1102.5(c), and the public policy enacted in those statutes to protect

17  whistleblower employees from retaliation.

18      6.    Among other things, the FCA prohibits knowingly presenting, or

19  causing to be presented, a false or fraudulent claim for payment or approval.  31

20  U.S.C. § 3729(a)(1)(A).  Additionally, it prohibits knowingly making, using, or

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

causing to be made or used, a false or fraudulent record or statement (i) material to a false or fraudulent claim or (ii) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal government.  31 U.S.C. § 3729(a)(1)(B), (a)(1)(G).  Finally, it prohibits defendants conspiring with one another to submit false claims.  31 U.S.C. § 3729(a)(1)(C).

7.     The California FCA similarly prohibits the conduct described above. It additionally prohibits being a beneficiary of an inadvertent submission of a false claim, discovering the falsity, and failing to disclose the false claim to the government within a reasonable time after discovery.  Cal. Gov't Code §§ 12651(a)(1), (a)(2), (a)(7), (a)(8).

8.     The FCA protects employees from retaliation when they attempt to stop their employers from defrauding the government.  Section 3730(h) of the FCA provides that:

> "Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . to stop 1 or more violations of [the FCA]."

9.     The California FCA also protects employees from retaliation.  Section 12653 of the California FCA contains similar language to the FCA provision quoted above.

10.     Both the FCA and California FCA provide that an employee who is

retaliated against in violation of those statutes is entitled to:

> "reinstatement with the same seniority status that the employee . . . would
> have had but for the discrimination, two times the amount of back pay,
> interest on the back pay, and compensation for any special damages
> sustained as a result of the discrimination."

31 U.S.C. § 3730(h)(2); Cal Govt. Code § 12653(b).  In addition, the California

FCA provides that such an employee is entitled, "where appropriate, [to] punitive

damages."  *Id.*

11.    Each of the Defendants who engaged in retaliation against Plaintiff in

violation of law is not presently known by Plaintiff and is listed herein as a Doe

Defendant.

## III.    PARTIES

12.    Plaintiff Jean Diesto is a United States citizen who resides in

California.  She has extensive experience in the treatment of and programs

associated with chronic kidney disease.  Diesto has been a registered nurse since

1977.  She was employed by Fresenius Medical Care North America in January

2010 as Vice President of Strategic Business Operations until her termination in

October 2013.

13.    Defendant Fresenius Medical Care Holdings, Inc., is a New York

corporation, registered to do business in California as well as other states.  The

corporation operates under the d/b/a name of Fresenius Medical Care North

America.  Its principal North American executive office is located at 920 Winter

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Street, Waltham, Massachusetts.

14.    Defendant Fresenius Management Services, Inc., is a Delaware corporation, doing business in the State of California.  Its principal office is located 920 Winter Street, Waltham, Massachusetts.

15.    The identities of the remaining Doe Defendants are presently unknown to Plaintiff. All listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in the fraud and retaliation against Plaintiff described herein.

## IV.    BACKGROUND

### A.    Chronic Kidney Disease

16.    CKD is a condition characterized by a gradual loss of kidney function.  When kidney disease progresses, patients may develop complications including high blood pressure, anemia, and nerve damage.  Without treatment, CKD may lead to kidney failure, which requires dialysis or a kidney transplant to maintain life.  *See National Kidney Foundation, https://www.kidney.org /kidneydisease/aboutckd.*

### B.    End Stage Renal Disease

17.    End Stage Renal Disease ("ESRD") is a condition in which the kidneys no longer function at a level necessary for day-to-day life.  The loss of kidney function in ESRD is usually irreversible and permanent.  Treatment options

include kidney transplantation and dialysis. *See American Kidney Fund, http://www.kidneyfund.org/kidney-health/kidney-failure/end- stage-renal- disease.html*. Dialysis is usually administered to patients in a hospital setting, defined by Medicare as a dialysis center, or in a renal dialysis facility that is approved to furnish dialysis services directly to ESRD patients. *See* 42 C.F.R. § 405.2102 (2014). Defendants herein operate such renal dialysis facilities.

**C. The Medicare Program**

18. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

19. Medicare is divided into four parts. Of relevance here, Medicare Part A pays for care in a hospital, skilled nursing facility, hospice, and renal dialysis facility. Medicare Part B pays the cost of services performed by physicians and certain other health care providers. Medicare provides benefits for patients with ESRD under both Parts A and B. Individuals otherwise ineligible for Medicare become eligible when they develop ESRD. 42 C.F.R. § 405.2102 (2014).

20. Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury." Social Security Act § 1862(a)(1)(A); 42 U.S.C. § 1395y(a)(1)(A). Providers who wish to participate in the Medicare program must ensure that their services are

provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

21.     Primary responsibility within the U.S. Department of Health and Human Services for administration of the Medicare program has been delegated to the Centers for Medicare and Medicaid Services ("CMS").  Private entities, called "Medicare Administrative Contractors," previously called "intermediaries," contract with CMS to process the Medicare Part A and Part B claims submitted by providers.  *See* 42 C.F.R. § 421.5(b) (2014).

22.     Since 1972, the federal government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program regardless of age or financial circumstances.  Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests and medications.  Other government health care programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

### D.     The Medicaid Program

23.     Medicaid was also created in 1965 under Title XIX of the Social Security Act.  Funding for Medicaid is shared between the federal government and those states participating in the program.  Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. §§ 1396 *et seq.*, federal money is distributed

to the states, which in turn provide certain medical services to the poor.  Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("HHS").  After HHS approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. § 1396b(a)(1).  The California Department of Health Care Services is the state agency responsible for administration of the California State Medicaid Program ("Medi-Cal").

24.    Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.  Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all federal and state Medicaid requirements, including the fraud and abuse provisions and the Anti-Kickback statutes.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

**E.    Applicable Law**

**1.    Federal and State Anti-Kickback Statutes**

25.    The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1972 and has been amended many times since.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions corrupts medical decision-making and can result in goods and services being provided that are medically inappropriate, unduly costly, medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal Health Care Programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

26.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute provides, in pertinent part:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

(b) Illegal remunerations**

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

a.   To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or

b.   To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

27.   The State of California also has an anti-kickback law similar to the AKS, which applies to medical providers and entities participating in the California Medicaid program. *See* Cal. Welf. & Inst. Code § 14107.2.

28.   Violations of the federal or state AKS laws can subject the perpetrator to liability under the federal and state FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim.  *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), adding 42 U.S.C. § 1320a-7b(g) to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims

for purposes of the federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required).  Accordingly, claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § 1320a-7b(g); *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005).

29.    Compliance with the Anti-Kickback Statute is a precondition to participation and to payment as a health care provider under Medicare, Medicaid, and other Government Health Care Programs.  *See generally United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare); *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (California Medicaid).

30.    Either pursuant to provider agreements, claim forms, or elsewhere, hospitals and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

31.    The AKS covers any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d

1092, 1094 (5th Cir. 1998).  The AKS is "violated, even if the payments were also intended to compensate for professional services." *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (quoting *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)).

32.     HHS has published safe harbor regulations that define practices not subject to the AKS because such practices would be unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952 (2014).  The safe harbors set forth specific conditions that, if met, insulate providers from prosecution or sanctions for the arrangement qualifying for the safe harbor.  However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

33.     The burden is on a defendant to establish that its conduct fell within a safe harbor or exception.  No such safe harbor provisions apply to Defendants' conduct set forth herein.

**2.     Certifications**

34.     Defendant Fresenius has expressly certified compliance with the law, including the AKS, on its annual cost reports.  Each cost report states:

> If *services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal*, criminal, civil and administrative action, fines and/or imprisonment may result (emphasis added). *Form CMS-2552-10*.

35.     The cost report certification was signed by an officer or administrator

of Fresenius, who certified that "I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations." *Id.* Since the certifications are a prerequisite to payment, and Fresenius' express certifications were and continue to be knowingly false for the reasons set forth herein, Fresenius has violated the FCA and California FCA.

36.     Fresenius also falsely certified compliance with the AKS through form CMS-855A, the enrollment application that providers must execute to participate in the Medicare program.  The form contains the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions *(**including but not limited to, the Federal anti-kickback statute and the Stark law**)*, and on the provider's compliance with all applicable conditions of participation in Medicare.  (Emphasis added).

**3.     Law Pertaining to Kidney Disease Education Services**

37.     The Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA") added kidney disease patient education ("KDE") services as a Medicare covered benefit for Medicare beneficiaries with Stage IV chronic kidney disease.  The Part B services were designed to provide beneficiaries with

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

comprehensive information regarding: (1) management of co-morbidities, including for purposes of delaying the need for dialysis; (2) prevention of uremic complications; and (3) each option for renal replacement therapy.  The benefit was also designed to be tailored to individual needs and provide the beneficiary with the opportunity to actively participate in his/her choice of therapy.  Such services were payable effective January 1, 2010.  MIPPA § 152(b); 42 U.S.C. § 1395x(s)(2)(EE); *CMS Medicare Claims Processing Manual, Chapter 32, § 20 and Transmittal 1876*.

38.     KDE services must be furnished by a "qualified person," meaning a: (1) physician, (2) physician assistant, nurse practitioner, or clinical nurse specialist, (3) hospital, critical access hospital ("CAH"), skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, or hospice, if the KDE services are provided in a rural area, or (4) hospital or CAH that is designated as rural.  MIPPA § 152(b); 42 U.S.C. § 1395x(ggg)(1)(B); *Medicare Benefit Policy Manual, Chapter 15, § 310.2; 42 C.F.R. § 410.48* (2014).

39.     The statute expressly excludes renal dialysis facilities, such as those of Defendants, from being "qualified persons."  This exclusion also applies to a dialysis facility that is located within a hospital.  After public meetings and receipt of comments on the newly proposed Medicare benefit, CMS stated that the statute:

> explicitly excludes renal dialysis facilities from being "qualified persons" for purposes of the kidney disease education benefit.  **The**

15

**statute does not provide an exception for dialysis facilities located within hospitals.  We do not consider dialysis facilities located in a hospital to be different from a freestanding dialysis facility for purposes of the statutory exclusion**.  (Emphasis added.)

*Federal Register, Vol. 74, No. 226, Wednesday, November 25, 2009, at 61895.*

## V.    ALLEGATIONS

40.    Plaintiff incorporates by reference and realleges as though fully set forth herein all preceding paragraphs.

41.    Through reporting, investigating, and attempting to stop the fraudulent conduct of Defendants, Diesto was discharged and discriminated against in the terms and conditions of her employment.  Diesto opposed Defendants' practices and procedures to: (a) establish illegal consulting agreements with nephrology groups in which Fresenius furnished free services to the groups in violation of the AKS, and (b) bill for KDE services in CKD clinics that were located inside its own dialysis facilities in violation of Medicare's payment rules.  Plaintiff refused to participate in programs that she reasonably and in good faith believed would violate federal and state law.

### A.    Consulting Agreements

42.    In or about March 2010, Fresenius established consulting agreements with certain nephrology groups.  Under these agreements, Fresenius placed one or more of its CKD nurses, now called "Renal Care Coordinators" ("RCCs"), to work full time in the nephrologists' practices.  The nurses were to provide CKD services

to the nephrologist's late-stage CKD patients.  Fresenius initially required the nephrology groups to pay Fresenius about one-half of each RCC's salary, or about $5,000 per month.  However, in or about June 2013, under direction from Eric Maaske ("Maaske"), recently hired by Fresenius as the new Vice President, Comprehensive CKD Services, Fresenius changed its agreements with the nephrology groups so that the groups no longer paid Fresenius at all for the services of the RCCs.

43.    In May 2013, Maaske told Diesto that he intended to convert Fresenius' existing CKD clinics into RCC "joint ventures" with the nephrology groups.  He stated that CKD clinics that could not be converted would be designated for closure.  Maaske told Diesto that this new program would filter more late-stage CKD patients into Fresenius' dialysis facilities and do so more quickly, thereby doubling the number of these clinics by year-end 2013 as required by Defendants' leadership.

44.    Diesto opposed Maaske's plans, advised him that the provision of free RCCs to nephrologists violated AKS, and informed him that the purpose of CKD programs was not to serve as a funnel for Defendants' dialysis business.  Diesto repeatedly told Maaske that his changes would violate Medicare rules.  She also voiced her opposition to the RCC program to Dr. Dugan Maddux, who had preceded Maaske as Vice President of Comprehensive CKD Services.

45.     Maaske asked Diesto to attend a presentation to the RCCs in Chicago regarding his changes to the CKD program.  He scheduled the presentation for the middle of June 2013, despite the fact that Diesto had previously scheduled a vacation during that time period.  Diesto asked Maaske if he would reschedule the date of the presentation so she could attend, but Maaske refused.

46.     The material presented to the nurses at the presentation contained metrics to be applied in assessing the performance of the nurses.  For example, one such metric was called the "120 Day Graduation Rate," which was described as the percentage of CKD patients that went on to dialysis within 120 days.  The nurses were told that their performance would be based on the number and percentage of patients starting dialysis.  A grade of 94 percent was considered "awesome results."  Such a goal is contrary to the purpose of any CKD program, which is to slow or prevent progression of patients to ESRD.  Diesto reasonably believed, and complained to Fresenius, that Fresenius was using the RCC program to illegally offer kickbacks to physicians for the purpose of recruiting more patients for dialysis and to do so as quickly as possible by influencing the patients and their nephrologists to choose dialysis at a Fresenius clinic.

47.     Diesto believed that the metrics used to evaluate the RCCs created incentives to illegally induce the referral of patients to Fresenius.  She refused to hold weekly performance meetings with the RCCs to gather the necessary

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

information regarding the new performance metrics.

48.     After the Chicago presentation, Diesto received numerous complaints from several of the RCCs regarding compliance issues they saw in their new roles. The RCC nurses informed Diesto that they were required to sign new contracts with Fresenius and some advised Diesto that they refused to do so because of the compliance problems.  When some RCC nurses would not sign the new agreements, they were terminated.

49.     In August 2013, Maaske was attempting to convert Fresenius' Hawaii CKD clinic into an RCC practice.  According to Diesto, Maaske explained that the reasons for the conversion were that: (1) the CKD clinics were not profitable for Fresenius, and (2) the graduation rate of patients to dialysis was higher in the new RCC programs.  Ultimately, the nephrologists in Hawaii did not think the RCC model would benefit anyone but Fresenius, and, therefore, no RCC programs were established in Hawaii.  The Hawaii CKD clinic ceased to exist in 2014.

50.     Diesto reasonably and correctly believed that Defendants' conduct set forth above violated federal and state AKS law.  None of the statutory or regulatory safe harbor provisions on AKS apply to Defendants' conduct.  When Diesto complained about the conduct and attempted to stop it, she was illegally terminated.

**B.     Kidney Disease Education Services**

51.     Diesto also learned that Fresenius was falsely and fraudulently billing Medicare for kidney disease education services that were provided within its own dialysis facilities, in violation of the law.  Fresenius either established new entities that provided KDE services or applied to Medicare for its existing CKD clinics to provide these services.  In so doing, Fresenius purposely did not disclose in its applications to Medicare that the CKD clinics had the same location as its dialysis facilities.

52.     For example, in an application to Medicare on form CMS-855B, Medicare Enrollment Application, submitted in July 2012, Defendants stated that the location for Fresenius Medical Care Comprehensive CKD Services, Inc., a/k/a FMC CKD Services of East Orange, was 91 - 101 Hartford Street, Newark, New Jersey.  FMC CKD Services of East Orange provided and billed Medicare for KDE services.  Its location, however, is the same location as Fresenius' dialysis unit in Newark.

53.     Diesto, upon learning that Fresenius was billing Medicare for KDE services performed in entities physically located within its own dialysis facilities, directed that Defendants' compliance division conduct an audit to determine whether Fresenius was appropriately billing Medicare for such services.  The compliance division prepared a report stating that Fresenius was not in compliance

with the Medicare rules on KDE, and as a result, it could be forced to return all

payments.  Diesto then issued instructions to discontinue billing for KDE services.

54.     Diesto informed Fresenius staff on several occasions that KDE

services were not allowable when performed inside a dialysis facility.  For

example, in an email, dated November 27, 2012, Diesto told Barbara Cortes, RN,

with a cc to Dr. Dugan Maddux, Vice President of Comprehensive CKD Services,

that:

> Hi! Barbara. I have copied Dr. Maddux my response to request her
> comments.”YES” the CKD clinic should be in a separate location
> from a dialysis unit.  Aside from giving a picture of directing patients
> to a specific dialysis unit and mode of treatment, it is for the
> following reasons:
>
> 1. The application and license to operate is specific to a practice or
> clinic location and NOT a dialysis UNIT.
> (See attached file: 855B application.pdf)(See attached file: CKD
> Newark Medicare approval.pdf).
>
> 2. Renal dialysis facilities are precluded from providing billable
> services such as KDE (kidney disease education) and medical
> nutrition education for CKD patients.  KDE is a major component of
> the NP evaluation and Management visit that is billed.
> (See attached file: CMS KDE program.pdf).

55.     Medicare regulation, 42 C.F.R. § 410.48(c)(ii) (2014), specifically

prohibits payment for KDE services provided by a renal dialysis facility, such as

those of Defendants.  In addition, it is clear that CMS' intent was to prohibit

payment for KDE services when those services were provided within a dialysis

facility.  *See Federal Register, Vol. 74, No. 226, Wednesday, November 25, 2009,*

*at 61895*.

56.     After having been informed by its compliance division that  such KDE services could not be billed by those entities that were located inside of its dialysis facilities, Fresenius continued to bill and did not refund any payments received from the government.

### C.      Retaliation Against Diesto

57.     Diesto refused to participate in Defendants' programs that violated federal and state law.  As such, on August 9, 2013, as a result of Diesto's opposition to Defendants' illegal practices, Maaske notified Diesto that her position was to be eliminated.  Maaske explained that Fresenius had decided to close the CKD clinics and replace them with the RCC practices.  Although other executives in Diesto's unit had been offered a transfer or re-assignment, Diesto was terminated without any such options.  Diesto's last day of employment was on or about October 4, 2013.  As set forth above, Diesto was illegally and wrongfully terminated by Defendants.

### FIRST CAUSE OF ACTION

### Retaliation in Violation of the False Claims Act
### 31 U.S.C. § 3730(h)

58.     Diesto repeats and realleges each and every allegation contained in paragraphs 1-57, as though fully set forth herein.

59.     Through reporting, investigating, opposing, attempting to stop, and

22

refusing to support the fraudulent conduct of Defendants, Diesto was discharged and discriminated against in the terms and conditions of her employment by Defendants because of lawful acts done by the Plaintiff in an effort to stop one or more violations of the FCA.

60.    Diesto is entitled to all relief necessary to make her whole, including reinstatement with the same seniority to the position she had before the unlawful termination, 2 times the amount of back pay lost, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination.

## SECOND CAUSE OF ACTION

### Retaliation in Violation of the California False Claims Act
### Cal. Govt. Code § 12653

61.    Diesto repeats and realleges each and every allegation contained in paragraphs 1-57, as though fully set forth herein.

62.    Through reporting, investigating, opposing, attempting to stop, and refusing to support the fraudulent conduct of Defendants, Diesto was discharged and discriminated against in the terms and conditions of her employment by Fresenius because of lawful acts done by Plaintiff in an effort to stop one or more violations of the California FCA.

63.    Diesto is entitled to all relief necessary to make her whole, including reinstatement with the same seniority to the position she had before the unlawful termination, 2 times the amount of back pay lost, interest on the back pay,

1   compensation for any special damages sustained as a result of the discrimination,

2   and punitive damages.

3   ### THIRD CAUSE OF ACTION

4   ### Retaliation in Violation of California Labor Code § 1102.5(c)

5   64.    Diesto repeats and realleges each and every allegation contained in

6   paragraphs 1-57, as though fully set forth herein.

7   65.    At all times mentioned herein, Cal. Labor Code § 1102.5(c) was in

8   full force and effect and was binding on Defendants.

9   66.    Diesto opposed Defendants' practices and procedures to illegally

10   offer kickbacks to funnel patients to dialysis at Fresenius and to falsely bill for

11   KDE services.  She refused to participate in programs that she reasonably and in

12   good faith believed would violate federal and state law.

13   67.    Diesto's opposition and refusals to participate in programs that she

14   believed would violate state and federal law was a substantial motivating factor in

15   Defendants' decision to terminate Diesto's employment.

16   68.    As a proximate result of the aforesaid acts of Defendants, and each of

17   them, Plaintiff has suffered actual, consequential, and incidental financial losses,

18   including without limitation, loss of salary and benefits, and the intangible loss of

19   employment related opportunities in her field and damage to her professional

20   reputation, all in an amount subject to proof at the time of trial.  In addition to such

21

damages, Plaintiff claims damages pursuant to California Civil Code §§ 3287-3289 and/or any other provision of law providing for prejudgment interest.

69.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer from emotional distress which manifests itself in stress and anxiety.  Plaintiff is informed and believes and thereupon alleges that she will continue to experience said emotional and physical suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

70.     The acts taken toward Plaintiff were carried out by Defendants and their officers, directors, and/or managing agents in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff, thereby justifying an award of punitive damages under California Civil Code § 3294 in a sum appropriate to make an example of Defendants, and each of them.

## FOURTH CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

71.     Diesto repeats and realleges each and every allegation contained in paragraphs 1-57, as though fully set forth herein.

72.     At all times mentioned herein, Cal. Labor Code § 1102.5(c) was in full force and effect and was binding on Defendants.

25

73.     Diesto opposed Defendants' practices and procedures to illegally offer kickbacks to funnel patients to dialysis at Fresenius and to falsely bill for KDE services.  She refused to participate in programs that she reasonably and in good faith believed would violate federal and state law.

74.     Diesto's opposition and refusals to participate in programs that she believed would violate state and federal law was a substantial motivating factor in Defendants' decision to terminate Diesto's employment.

75.     As a proximate result of the aforesaid acts of Defendants, and each of them, Plaintiff has suffered actual, consequential, and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment related opportunities in her field and damage to her professional reputation, all in an amount subject to proof at the time of trial. In addition to such damages, Plaintiff claims damages pursuant to California Civil Code §§ 3287-3289 and/or any other provision of law providing for prejudgment interest.

76.     As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer from emotional distress which manifests itself in stress and anxiety. Plaintiff is informed and believes and thereupon alleges that she will continue to experience said emotional and physical suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

77.     The acts taken toward Plaintiff were carried out by Defendants and their officers, directors, and/or managing agents in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and inexcusable manner and in conscious disregard for the rights and safety of Plaintiff, thereby justifying an award of punitive damages under California Civil Code § 3294 in a sum appropriate to make an example of Defendants, and each of them.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For statutory penalties, according to proof

2.     For declaratory relief, according to proof

3.     For injunctive relief, according to proof

4.     For general damages, according to proof

5.     For special damages, according to proof

6.     For loss of earnings, according to proof

7.     For restitution, according to proof

8.     For prejudgment interest, according to proof

9.     For attorney's fees, according to proof

10.     For punitive and exemplary damages, according to proof

11.     For costs of suit incurred herein; and

12.     For such other further relief as the Court deems just and proper

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

DATED: AUGUST 6, 2015        By: ___/s/_____
Anthony B. Lewis, Esq.
CA Bar No. 237354
THE LEWIS LAW FIRM
16000 Ventura Blvd., Suite 1205
Encino, CA 91436
Telephone: 818-338-6930
Facsimile: 818-338-6935
alewis@lewisla.com
mgrimm@lewisla.com

DATED: AUGUST 6, 2015        By: ___/s/_____
Michael A. Hirst, Esq.
CA Bar No. 131034
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
Telephone: 530-756-7700
Facsimile: 530-756-7707
michael.hirst@hirstlawgroup.com

Attorneys for Plaintiff Jean Diesto

## **CERTIFICATION**

Pursuant to Local Rule 5-4.3.4, the filing attorney attests that he and all other signatories listed above, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

DATED: AUGUST 6, 2015        By: ___/s/_____
Anthony B. Lewis, Esq.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

1

## <u>JURY TRIAL DEMAND</u>

2

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Diesto hereby

3

demands a trial by jury.

4

5

DATED:  AUGUST 6, 2015                    By:___/s/_____
                                               Anthony B. Lewis, Esq.

6                                              CA Bar No. 237354
                                               Mario L. Grimm, Esq.

7                                              CA Bar No. 279164
                                               THE LEWIS LAW FIRM

8                                              16000 Ventura Blvd., Suite 1205
                                               Encino, CA  91436

9                                              Telephone: 818-338-6930
                                               Facsimile: 818-338-6935

10                                             alewis@lewisla.com
                                               mgrimm@lewisla.com

11

DATED:  AUGUST 6, 2015                    By:___/s/_____

12                                             Michael A. Hirst, Esq.
                                               CA Bar No. 131034

13                                             HIRST LAW GROUP, P.C.
                                               200 B Street, Suite A

14                                             Davis, CA 95616
                                               Telephone: 530-756-7700

15                                             Facsimile: 530-756-7707
                                               michael.hirst@hirstlawgroup.com

16                                             Attorneys for Plaintiff Jean Diesto

17

18

19

20

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES